Louis OSOFSKY, Plaintiff-Appellant,

v.

George C. ZIPF et al., Defendants-Appellees.

Rose UDOFF, Plaintiff-Appellant,

v.

BABCOCK & WILCOX COMPANY et al., Defendants-Appellees.

Nos. 470, 471, Dockets 80–7643, 80–7653.

United States Court of Appeals, Second Circuit.

Argued Dec. 5, 1980.

Decided March 19, 1981.

Stanley L. Kaufman, Kaufman, Taylor, Kimmel & Miller, New York City (Irving Malchman, New York City, of counsel), for plaintiff-appellant Osofsky.

Robert M. Kornreich, Wolf, Popper, Ross, Wolf & Jones, New York City, of counsel, for plaintiff-appellant Udoff.

Robert B. Fiske, Jr., New York City (William L. Rosoff, Joan Guggenheimer, Davis, Polk & Wardwell, New York City, of counsel), for defendant-appellee J. Ray McDermott & Co., Inc., and certain individual defendants.

Paul M. Dodyk, Carlos E. Mendez-Penate, Cravath, Swaine & Moore, New York City, of counsel, for defendant-appellee Morgan Stanley & Co. Inc.

Richard J. Urowsky, Sullivan & Cromwell, New York City, of counsel, for defendant-appellee Babcock & Wilcox Co. and certain individual defendants.

Paul J. Bschorr, Richard W. Reinthaler, Frederick R. Rohn, White & Case, New York City, of counsel, for defendant-appellee Smith Barney, Harris Upham & Co. Inc.

Richard A. Kirby, Washington, D. C. (Ralph C. Ferrara, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Paul Gonson, Solicitor, Robert Lipsher, Securities and Exchange Commission, Washington, D. C., of counsel), for Securities and Exchange Com'n as amicus curiae.

Before OAKES and MESKILL, Circuit Judges, and GAGLIARDI, District Judge.*

OAKES, Circuit Judge:

This appeal presents the single narrow question whether shareholders who cede control of their company as a result of alleged misrepresentations concerning the

* Of the Southern District of New York, sitting by designation.

value of the consideration they would obtain in a merger after successful completion of a tender offer have stated a claim for damages under the Securities Exchange Act of 1934 (1934 Act). This question turns on whether the term "actual damages," as used in section 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a), encompasses nonspeculative, compensatory damages as measured not only by out-of-pocket loss but also by the benefit-of-the-bargain standard. The United States District Court for the Southern District of New York, John M. Cannella, Judge, held that the shareholders may not obtain the difference between what it was represented they would obtain in the merger and what they actually obtained, in the absence of allegations that the shares of the target company they gave up were actually worth more than the preferred stock package they received in exchange, and in the absence of any claim that "windfall" profits were received as a result of the allegedly misleading statements. We disagree, and reverse and remand on the issue of damages. We decline to reach the arguments of appellees as to whether appellants have stated a valid claim under section 14(a) and section 14(e) of the 1934 Act, 15 U.S.C. §§ 78n(a), 78n(e), since the district court did not rule upon these issues.

## FACTS

The two cases involved in this appeal arise out of the tender offer contest in August 1977 between J. Ray McDermott & Co., Inc. (McDermott),[1] and United Technologies Corporation (United) for control of the Babcock & Wilcox Company (B & W), in which McDermott emerged as the successful bidder. On August 4, 1977, United made a tender offer, scheduled to expire on August 25, to buy all outstanding shares of B & W common stock at $48 per share. McDermott responded, on August 14, with an offer (also scheduled to expire on August 25) to buy up to 4.3 million shares (approximately 35% of B & W's outstanding common stock) at $55 per share; the directors of B & W recommended acceptance of McDermott's offer. McDermott acknowledged that it already owned 1.2 million shares of B & W common, and conditioned its purchase of up to 4.3 million additional shares on the tender of at least 2.5 million shares by August 24, the day before the scheduled expiration date. The offer to purchase disclosed that McDermott had advised B & W that if McDermott's tender offer were successful, it would propose a combination of the two companies, and that, even though the terms of such a combination had yet to be negotiated, McDermott believed that "the consideration to be received by [B & W's] stockholders in such combination would have to approximate the price paid pursuant to this Offer."

McDermott's initial tender offer was followed by a series of offers by the two contending companies, sweetening up the deal for B & W shareholders. On August 18 United increased its offer from $48 to $55 per share. The following day McDermott increased its price to $60 per share and extended its expiration date to August 30. Three days later United increased its offer to purchase all outstanding shares of B & W to $58.50. Meanwhile the price of B & W stock was rising in response to these events. On August 24 B & W declared a special dividend of $2.50 per share payable to stockholders of record on September 14, 1977, and B & W's directors reiterated their endorsement of McDermott's tender offer. On the same day United announced that B & W shareholders who tendered to United would receive one-half of the $2.50 per share special dividend in addition to the $58.50 in cash offered. The following day, August 25, McDermott amended its offer to increase from 4.3 million to 4.8 million the number of shares it would purchase and to increase its tender price to $62.50 per share. In addition, McDermott extended its expiration date to September 3 and offered to pass on to tendering stockholders the full $2.50 special dividend. United withdrew from the bidding battle.

By September 3, 9.3 million shares of B & W common stock had been tendered to

1. The company's name has now been changed to McDermott, Inc.

McDermott, which purchased approximately 4.8 million shares (on a pro rata basis) giving it 49% of the outstanding common stock of B & W as of September 16, 1977. McDermott and B & W issued a joint proxy statement on February 22, 1978, contemplating an effective merger date of March 31, 1978. The proposed terms of the merger were that each B & W share not owned by McDermott would be exchanged for a package of McDermott securities consisting of one share of a $2.60 cumulative preferred stock and one share of a $2.20 convertible cumulative preferred stock. The joint proxy statement quoted the language from the offer to purchase regarding the consideration believed to be required for the merger; the statement also included an opinion of B & W's financial adviser, Morgan Stanley & Co. Incorporated, that the market value of the package of McDermott preferred stock into which each share of B & W common stock would be converted upon consummation of the merger "would approximate $62.50." The stockholders approved the merger. On March 31, the effective day of the merger, the combined closing price of the McDermott stock package on the New York Stock Exchange was approximately $59.88.

Appellant Osofsky alleged that McDermott had violated section 14(e) of the 1934 Act, 15 U.S.C. § 78n(e), by making a fraudulent promise in connection with a tender offer—namely, McDermott's statement that it believed that the consideration eventually to be received by B & W's shareholders with respect to the merger would have to approximate the tender offer price.[2] Appellant Udoff's complaint contained essentially the same allegations, but in addition claimed that the joint proxy statement in connection with the merger contained materially misleading statements, in violation of section 14(a) of the 1934 Act, 15 U.S.C. § 78n(a).

Because both Osofsky and Udoff had moved for an order consolidating the two actions, as well as for class certification, the court below treated the two complaints as if all allegations were included in each. The district court did not reach the appellants' motions to consolidate and for class action status, however, but instead granted the appellees' motion for summary judgment. For purposes of the appellees' motion, the court assumed the truth of the allegations in the complaint, pursuant to *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). Thus it assumed, first, that appellees misrepresented the eventual compensation to be paid in connection with the merger—because they did *not* actually believe that the compensation would "approximate the price paid pursuant to" the tender offer—and second, that reasonable shareholders relied on McDermott's misrepresentations in tendering a percentage of their shares to McDermott rather than tendering all of their shares to United. The court further assumed that at the time of issuing the proxy materials, the offeror, the target, and their respective financial advisers (who are also appellees in this case) believed that the McDermott preferred stock package would *not* have a market value of approximately $62.50, and that the shareholders who voted on the merger relied on the appellees' statements to the contrary. The court nevertheless held as a matter of law that the appellants had alleged no loss compensable under the 1934 Act, and therefore that they had failed to state a claim under the securities law.[3]

The district court's decision was based on section 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a) which prohibits recovery in a suit under the Act of "a total amount in excess of . . . actual damages." The court relied principally upon *Levine v. Seilon, Inc.*, 439 F.2d 328 (2d Cir. 1971), which it interpreted

---

2. Osofsky also alleged violations of section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and rule 10b–5, 17 C.F.R. § 240.10b–5 (1980), as well as breach of fiduciary duty by McDermott and the directors of B & W and breach of contract, claims that are not at issue on appeal.

3. The district court also dismissed the pendent state law claims, *see* note 2 *supra*, pursuant to Fed.R.Civ.P. 12(b)(1) and *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

"as barring any recovery by a defrauded party based upon the 'benefit of the bargain' rule, that is, for 'the difference between the value of what he got and what it was represented he would be getting,' *id.* at 334." Because the appellants suffered no "out-of-pocket" damages, the court below held that they could not recover under the 1934 Act.

### DISCUSSION

 The question raised in this appeal is whether section 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a), and relevant decisions in this circuit require the result reached by the district court, and, if not, what the proper rule of damages should be in this case. Section 28(a) speaks only in general terms,[4] but we do not believe that its overall intent is to restrict the forms of nonspeculative, compensatory damages available to defrauded parties. The statutory language suggests that one purpose of section 28(a) is to prevent double recovery by those who assert both state and federal claims arising out of the same conduct. *See* 3 L. Loss, *Securities Regulation* 1624 & n.5 (2d ed. 1961). In addition, section 28(a) had been construed as prohibiting the recovery of punitive, as opposed to compensatory, damages. *See, e. g., Byrnes v. Faulkner, Dawkins & Sullivan,* 550 F.2d 1303, 1313 (2d Cir. 1977); *Gould v. American-Hawaiian Steamship Co.,* 535 F.2d 761, 781 (3d Cir. 1976); *Green v. Wolf Corp.,* 406 F.2d 291, 302–03 (2d Cir. 1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). But it is clear that the "federal courts have the power to grant all necessary remedial relief," *J. I. Case Co. v. Borak,* 377 U.S. 426, 435, 84 S.Ct. 1555, 1561, 12 L.Ed.2d 423 (1964), and that the statute should be so construed as to carry out its purpose, *see id.* at 433, 84 S.Ct. at 1560; *Green,* 406 F.2d at 303. Accordingly, we believe that the purpose of section 28(a) is to compensate civil plaintiffs for

economic loss suffered as a result of wrongs committed in violation of the 1934 Act, whether the measure of those compensatory damages be out-of-pocket loss, the benefit of the bargain, or some other appropriate standard.

Although the term "actual damages" is not defined in the statute itself, it had an accepted meaning when the Securities Exchange Act was enacted in 1934. As used in the patent statutes, for example, the term had been construed as requiring damages to be "given as a compensation, recompense, or satisfaction to the plaintiff, for an injury actually received." *Birdsall v. Coolidge,* 93 U.S. 64, 64, 23 L.Ed. 802 (1876). The Supreme Court elaborated, "[c]ompensatory damages and actual damages mean the same thing; that is, that the damages shall be the result of the injury alleged and proved, and that the amount awarded shall be precisely commensurate with the injury suffered . . . ." *Id.* The Court also noted that "there cannot be any one rule of damages prescribed which will apply in all cases, even where it is conceded that the finding must be limited to actual damages." *Id.* at 70; *see also Palmer v. Connecticut Railway & Lighting Co.,* 311 U.S. 544, 552, 560–61, 61 S.Ct. 379, 384–385, 85 L.Ed. 336 (1941) (construing "actual damages" in the Bankruptcy Act as synonymous with nonspeculative, compensatory damages, and noting that "[t]he ways compensatory damages may be proven are many").

To be sure, this court in *Levine v. Seilon, Inc.,* 439 F.2d 328 (2d Cir. 1971), denied benefit-of-the-bargain damages in a suit by a preferred stockholder who was promised an exchange offer of common for preferred, but whose preferred stock was subsequently redeemed by the company. That case, however, is distinguishable from the instant one. The *Levine* plaintiff alleged that the company had promised the favorable ex-

---

**4.** Section 28(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a), provides in part:

The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.

change offer in order to induce the preferred shareholders to give the necessary consent to new credit arrangements for the issuer, but that the issuer failed to carry out the promised exchange and instead used the newly obtained credit to redeem all the preferred stock. Levine sued under sections 10(b) and 14(e) of the 1934 Act, 15 U.S.C. §§ 78j(b), 78n(e), alleging that this fraud had misled him into retaining his preferred shares in anticipation of the exchange for common, when he could have sold the shares "at a substantially higher price than the redemption acquisition price." *Id.* at 331. But this court found two independent deficiencies in the plaintiff's theory: a lack of causal relation between the preferred stockholders' consent and the raising of the funds needed for the redemption, and no allegation that the preferred shares, considered apart from the exchange offer, had an investment value greater than the price at which they were redeemed. Thus the plaintiff in *Levine* was seeking to recover the benefit of the bargain that he would have obtained had he *not* been fraudulently induced to consent to the credit arrangements, and had he then sold his shares at a price that had been inflated due to the company's fraudulent exchange offer. *Id.* at 333–34. This is in contrast to the instant case, in which B & W stockholders were allegedly fraudulently induced to enter into the very transactions—the ceding of control of their company to McDermott and the subsequent merger—for which they now seek to recover benefit-of-the-bargain damages.

Nevertheless, the language of Judge Friendly, writing for the panel in *Levine*, is quite broad. He stated in dictum that the pre-*Erie* rule in the federal courts, as well as the standard under rule 10b–5, is that a defrauded *buyer* of securities "is entitled to recover only the excess of what he paid over the value of what he got, not, as some other courts had held, the difference between the value of what he got and what it was represented he would be getting." *Id.* at 334. The two common law fraud cases cited for this proposition, however, *Smith v. Bolles*, 132 U.S. 125, 10 S.Ct. 39, 33 L.Ed.

279 (1889), and *Sigafus v. Porter*, 179 U.S. 116, 21 S.Ct. 34, 45 L.Ed. 113 (1900), involved situations in which the representations as to what the buyers were receiving were highly speculative. In *Smith*, the plaintiff had made a speculative investment in a silver mine, and subsequently discovered that his shares were worthless. The Court held that he could recover only the money he had actually invested, not the fraudulently represented "expected fruits of an unrealized speculation." 132 U.S. at 129–30, 10 S.Ct. at 40–41. The Supreme Court applied the same rule in *Sigafus*, where a party was fraudulently induced to invest in a gold mine whose value had been exaggerated by the seller, the Court saying: "'The true measure of damages ... is the loss which he has sustained, and not the profits which he might have made by the transaction. It excludes all speculation, and is limited to compensation.'" 179 U.S. at 123, 21 S.Ct. at 37 (quoting *Rockefeller v. Merritt*, 76 F. 909, 914 (8th Cir. 1896)).

But the case of a defrauded securities buyer, whose gain was speculative, is surely different from the case of a seller who does not receive the price for which he had bargained. The distinction lies in the ability to determine the amount of damages with certainty. In fact, Judge Friendly in *Levine* contrasted the rule stated above in connection with a defrauded securities buyer with the rule in the case of a defrauded seller, who is entitled not only to "the difference between the actual value and what he received at the time of sale," but also "added profits which the buyer has realized through accretions in value subsequent thereto ... or which the seller would have realized had he retained the stock for a reasonable period after the disclosure." 439 F.2d at 334 (citing *Janigan v. Taylor*, 344 F.2d 781, 786–87 (1st Cir.), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), and *Myzel v. Fields*, 386 F.2d 718, 744–47 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). Thus, at least in the case of a defrauded seller, as was the plaintiff in *Levine*, Judge Friendly's opinion fully recognized that the meas-

ure of damages could be other than simple out-of-pocket loss. Unfortunately for the plaintiff in *Levine*, the court found that, "under the unusual facts of [that] case," 439 F.2d at 334, he had received from the allegedly defrauding company as much as or more than the stock was worth, and the company had obtained no "windfall." Therefore, the defrauded seller rules were not applicable.

In another case, *Zeller v. Bogue Electric Manufacturing Corp.*, 476 F.2d 795 (2d Cir.), *cert. denied*, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973), Judge Friendly noted in dictum that *Levine* had repudiated benefit-of-the-bargain damages in 1934 Act suits brought by defrauded *buyers*, 476 F.2d at 801–02. But the holding in *Zeller* was that, for purposes of the equitable remedy of requiring a defrauding party to disgorge a windfall profit, the court would not differentiate between defrauded buyers and defrauded sellers, despite "the difficulty generally confronting the defrauded buyer in showing that the fraudulent seller has in fact reaped such a profit." *See id.* at 802 & n.10. This difficulty in determining the amount of damages with certainty, of course, is the reason for the dictum in *Levine* to the effect that the benefit-of-the-bargain measure of damages should not be used in the case of a defrauded buyer. In the instant case, however, where allegedly defrauded sellers were not paid the price which had been agreed upon, benefit-of-the-bargain damages are not at all speculative in nature. Thus we do not view our decision as inconsistent with the statements and reasoning in either *Levine* or *Zeller*.

Indeed, we agree with Judge Weinfeld in *Voege v. Ackerman*, 364 F.Supp. 72 (S.D.N.Y.1973), that "[n]othing said in *Zeller v. Bogue Electric Manufacturing Corp.*, or *Levine v. Seilon, Inc.*, which did not involve mergers, forecloses the possibility that plaintiffs might be entitled to the value which defendants represented they would receive." *Id.* at 73 (footnotes omitted). In

so holding Judge Weinfeld relied upon the Supreme Court's statement in *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 388, 90 S.Ct. 616, 623, 24 L.Ed.2d 593 (1970), a case involving a materially misleading proxy statement in connection with a merger, that "[w]here the defect in the proxy solicitation relates to the specific terms of the merger, the district court might appropriately order an accounting to ensure that the shareholders receive the value that was represented as coming to them." [5]

And a subsequent case in our court, *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281 (2d Cir. 1973), also written by Judge Friendly, confirms that the broad language of *Levine* and *Zeller* does not apply in a tender offer/merger situation such as we have here. Discussing damages in the context of a misleading proxy statement in connection with a merger, Judge Friendly referred specifically to the Supreme Court's language in *Mills*, quoted above, and viewed it as "seemingly addressed to exaggerated statements of the value of the securities to be received," *id.* at 1303—precisely the case at bar. The court in *Gerstle* read *Mills* as "commanding the lower courts to do their best to achieve fair compensation for injured plaintiffs without being too draconian on defendants, at least in a situation where the inadequacy of a proxy statement may lie more in a failure of articulation than in an outright desire to deceive." *Id.* at 1304.

Thus, in the instant case, where the misleading aspect of the solicitation *does* relate to the terms of the merger, we believe, to use the language of *Mills*, 396 U.S. at 388, 90 S.Ct. at 623, that "the district court might appropriately order an accounting to ensure that the shareholders receive the value that was represented as coming to them." This is precisely what then District Judge Mansfield did in *Norte & Co. v. Huffines*, 288 F.Supp. 855, 864 (S.D.N.Y.1968), *aff'd in relevant part, modified in part*, 416 F.2d 1189, 1191 (2d Cir. 1969), *cert. denied*, 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396

---

5. The Court's overriding theme in the *Mills* discussion is that "damages should be recoverable only to the extent that they can be shown." 396 U.S. at 389, 90 S.Ct. at 624. As

noted above, we believe that this emphasis on the certainty of damages underlies the reasoning in *Levine* and *Zeller*, and is consistent with our decision in the instant case.

(1970), and what Judge Weinfeld held could be done in *Voege v. Ackerman*, 364 F.Supp. 72, 73 (S.D.N.Y.1973).

■ Moreover, the benefit-of-the-bargain measure of compensatory damages is recognized as the preferable measure in common law fraud actions. *See* W. Prosser, *Handbook of the Law of Torts* § 110, at 733–34 (4th ed. 1971). Thus, the *Restatement (Second) of Torts* § 549(2) (1977) provides, in the case of a fraudulent misrepresentation in a business transaction, for the recovery of "damages sufficient to give [the recipient] the benefit of his contract with the maker, if these damages are proved with reasonable certainty." Though out-of-pocket loss may be the usual and logical form of compensatory relief in tort actions, Comment g on section 549(2) explains that this measure of damages does not always afford "just and satisfactory" compensation when the plaintiff has made a bargain based on fraudulent representations by the defendant. Therefore "the great majority of the American courts [have adopted] a broad general rule giving the plaintiff, in an action of deceit, the benefit of his bargain with the defendant in all cases, and making that the normal measure of recovery in actions of deceit." *Id.* Otherwise, in situations such as that involved in the instant case, "the defendant [would be] enabled to speculate on his fraud and still be assured that he [could] suffer no pecuniary loss," *id.* at Comment i.

■ We believe that the benefit-of-the-bargain rule should be applied under the 1934 Act to the limited situation involved in this case, where misrepresentation is made in the tender offer and proxy solicitation materials as to the consideration to be forthcoming upon an intended merger. But, of course, giving the plaintiff benefit-of-the-bargain damages is appropriate only when they can be established with reasona-

ble certainty. It seems that the speculative nature of benefit-of-the-bargain damages in the fact situations involved in *Levine, Smith*, and *Sigafus* underlay the rejection of this measure of damages in those cases. In the case at bar, however, the amount of such damages—the difference between what was represented as coming to the B & W shareholders and what they actually received—can be determined with certainty.

As a matter of policy, allowing a fraudulent tender offeror or merger survivor to avoid the benefit-of-the-bargain measure in a situation such as that presented in this case would "insulate from private redress" large categories of proxy statement and tender offer violations, *Mills*, 396 U.S. at 382, 90 S.Ct. at 620. Since the price paid by the successful offeror in a tender offer contest often exceeds the fair market value of the securities surrendered by the shareholders, defrauded shareholders of a target company would hardly ever, under the out-of-pocket measure of damages, have redress. Nor is it "draconian" to hold wrongdoers to the requirement of paying the consideration agreed upon in the first instance. Finally, this result furthers the purpose of sections 14(a) and 14(e) of the 1934 Act—deterrence of misrepresentations in connection with mergers and tender offers—and encourages private enforcement of the Act.

■ We note that the district court, as an alternative basis for its decision, concluded as a matter of law that the value of the consideration received by B & W shareholders in the merger—$59.88—was "approximately" the same as the consideration allegedly represented. But the difference between $59.88 and $62.50 is some 4%,[6] which is not so obviously unimportant that it can be viewed as immaterial as a matter of law. The Supreme Court has held that a fact is "material" "if there is a substantial likelihood that a reasonable shareholder would

---

**6.** We believe that the issue whether the tender offer price—and therefore the representation as to the merger consideration—was $62.50 or $65.00 (*i. e.*, whether McDermott's offer to pass on the special dividend to tendering shareholders increased the consideration paid to those shareholders) is a question for the trier of fact, since had McDermott not passed along the divi-

dend to tendering shareholders McDermott would have been entitled to keep it, although we recognize that the non-tendering or non-accepted shareholders of B & W also, of course, received the $2.50 special dividend. The difference between $59.88 and $65.00, of course, is even greater, amounting to some 8%.

consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Here we think that whether the alleged misrepresentations were "material" is a mixed question of law and fact, *see id.* at 450, 96 S.Ct. at 2132, particularly since there were competing tender offers and the alternative courses open to B & W's shareholders were either to accept McDermott's offer extending to *less than half* of the outstanding shares at $65.00 ($62.50 plus the $2.50 special dividend), or to accept United's offer for *all* outstanding shares at $59.75 ($58.50 plus one-half of the special dividend). If B & W shareholders had been informed by McDermott that they would ultimately exchange their non-tendered or non-accepted shares for cash and securities worth only $62.38 (McDermott securities valued at $59.88 plus the special dividend), then United might not have withdrawn its tender offer, and B & W shareholders might have assessed differently the desirability of accepting United's immediate offer at $59.75 for all shares, thereby avoiding waiting for their money. Thus it would not be unreasonable for the trier of fact to find that the alleged misrepresentation here was material, and therefore this issue should not have been decided on a motion for summary judgment.

Reversed and remanded.