Louis OSOFSKY and Nina Altman, individually and as executrix, sole legatee and sole distributee of the Estate of Rose Udoff, Appellants,

v.

J. RAY McDERMOTT & CO., INC. (now McDermott, Inc.), Appellee.

No. 374, Docket 83–7563.

United States Court of Appeals, Second Circuit.

Argued Nov. 14, 1983.

Decided Jan. 26, 1984.

Roger W. Kirby, New York City (Stanley L. Kaufman, Irving Malchman, Kaufman, Malchman & Kirby, P.C., Wolf, Popper, Ross, Wolf & Jones, New York City, of counsel), for appellants.

Richard E. Nolan, New York City (Scott W. Muller, Barbara E. Guss, John G. Rich, Davis, Polk & Wardwell, New York City, of counsel), for appellee.

Before OAKES, MESKILL, and PIERCE, Circuit Judges.

PER CURIAM:

This litigation arose out of the successful takeover in 1978 of Babcock and Wilcox

Company ("B & W") by what was then J. Ray McDermott and Company, Inc. ("McDermott"), after a tender offer contest with United Technologies Corporation ("United"). The plaintiffs-appellants, stockholders of B & W, claim that the defendant-appellee, McDermott,[1] (1) made a deceptive tender offer in violation of sections 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78n(e) (1976), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1983), (2) filed a materially misleading proxy statement in violation of section 14(a) of the Act, 15 U.S.C. § 78n, and Rule 14a–9, 17 C.F.R. § 240.14a–9, (3) breached their contract with B & W stockholders, and (4) breached their fiduciary duty to B & W stockholders. They base these contentions on McDermott's bidding for B & W during its contest with United and the terms on which B & W was subsequently merged with McDermott.[2]

This is the second time that this class action has come before the Court of Appeals. Previously the United States District Court for the Southern District of New York, John M. Cannella, Judge, had granted summary judgment against the plaintiffs on the narrow basis that they could not recover "benefit of the bargain" damages under section 28(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a), a decision which we reversed in *Osofsky v. Zipf,* 645 F.2d 107 (2d Cir.1981). On remand, the district court directed a verdict for defendants at the close of the plaintiffs' case and dismissed the complaint. It held that the evidence did not establish that McDermott acted with intent to defraud B & W stockholders or that the tender offer was false and misleading. Likewise, the court found that the proxy statement did not mislead B & W shareholders by stating that the tender offer was for $62.50 instead of $65.00 per share by virtue of the $2.50 dividend declared by B & W and "passed on" by McDermott. In addition, the court determined that the plaintiffs' state law claim of breach of fiduciary duty failed for lack of proof that McDermott controlled B & W. Finally, it held that the breach of contract claim failed because the plaintiffs failed to show that

1. The defendants below were McDermott, B & W, Morgan Stanley & Company (financial advisers to B & W in connection with the tender offer and subsequent merger of B & W and McDermott), Smith Barney Harris Upham & Company, Inc. (financial advisers to McDermott in the same matters), and the individual directors of B & W and McDermott. Appeal is taken only as to McDermott.

2. The relevant bidding for B & W was as follows. On August 4, 1977, United offered to buy all of B & W's common stock for $48.00 per share. On August 10, 1977, McDermott offered to buy, pro rata, 4.3 million shares (35% of the outstanding common stock) at $55.00 per share. The terms of the offer included the statement that if McDermott succeeded in its offer, it would propose a merger of itself with B & W. It stated further: "The Offeror believes that the consideration to be received by the Company's stockholders in such combination would have to approximate the price paid pursuant to this Offer."

The bidding continued, with United offering $58.50 and McDermott $62.50. On August 24, 1977, B & W announced a special dividend of $2.50, payable to holders of record on September 15, 1977. United then announced that it would pass through one-half of the dividend to shareholders who tendered their stock pursu-

ant to its offer. The next day, McDermott increased the number of shares it would buy from 4.3 to 4.8 million, and stated that "[t]endering stockholders whose shares are purchased pursuant to the amended offer will be entitled to receive the full amount of the $2.50 special dividend . . . ." At this point, United withdrew from the fight.

By September 4, 49% of B & W's stock had been tendered to McDermott. McDermott, however, did not begin purchasing the tendered shares until September 16. Accordingly, tendering shareholders received the special dividend of $2.50 per share from B & W.

In February, 1978, B & W and McDermott issued a joint proxy statement on the proposed merger. It stated that the package of McDermott stock that B & W shareholders would receive under the proposal would approximate $62.50 per share, the tender offer price. The shareholders approved the merger. On the day that the stock swap took place, the McDermott stock received by the B & W shareholders was worth $59.88 per share. This lawsuit was instituted by shareholders who argue that the price agreed to be paid by McDermott pursuant to the tender was actually $65.00 per share ($62.50 plus the $2.50 dividend), and thus the consideration they received upon the merger should have approximated $65.00 per share.

they did not receive the consideration promised. We affirm.

The most difficult issue before us is whether a reasonable jury could have found that McDermott's tender offer contained misleading statements. On the one hand, all of McDermott's material stated the tender offer price to be $62.50; the $2.50 special dividend came directly from B & W, not from McDermott; and there apparently was no testimony that any tendering shareholder in fact believed the price to be $65.00. Under *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 949 (2d Cir.1969), McDermott was not obligated to correct the statement on the Dow Jones tape that McDermott "effectively increased" the offer price to $65.00, since the statement was not attributable to McDermott. Viewed from this perspective, McDermott's offer price remained $62.50, and it sweetened its offer by not exercising its right to reduce this price (as its August 14 offer provided) to reflect B & W's dividend. On this interpretation, the appellants are merely attempting to "double dip"; i.e., having already received the special dividend in September, they now seek to have it included again in the merger consideration on their unaccepted or untendered stock.

On the other hand, in the context of McDermott's fight with United, a reasonable shareholder conceivably could have viewed McDermott's amended offer as one for $65.00 per share. The provision for the special dividend came in response to a move by United, and thus would seem to entail something more than maintaining McDermott's prior offer of $62.50. Indeed, the Dow Jones tape reported the pass-through of the dividend as an effective increase in McDermott's offer. So viewed, whether McDermott's move is characterized as foregoing its right to reduce the price or as increasing the bid itself, the effect is the same: to up the ante. *See Osofsky v. Zipf,* 645 F.2d at 114 n. 6.

Moreover, since the offer provided that purchase and payment would take place promptly after the deadline for tendering shares (September 3), and B & W's dividend

was to be paid to shareholders of record on September 15, tendering shareholders, if they thought about it at all, would have expected McDermott to be the holder of record. Accordingly, the special dividend would represent money coming directly out of McDermott's pocket. If the facts are so viewed, the mere fact that McDermott refrained from becoming a holder of record should not determine whether the $2.50 was part of the offer price. Rather, the relevant question is whether McDermott led shareholders to believe that the price paid included the dividend.

■ Thus, the facts can plausibly be construed as indicating that McDermott's tender offer price was $65.00. The plaintiffs failed to provide the evidence necessary to make such an interpretation more than mere conjecture, however. For example, they produced no evidence of reliance by shareholders on the allegedly misleading statements. Although reliance may sometimes be presumed from materiality, this court has held that reliance will be presumed only "where it is logical" to do so. *Lewis v. McGraw,* 619 F.2d 192, 195 (2d Cir.) (quoting *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 375 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973)), *cert. denied,* 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980). In this case, while it is conceivable that someone could have relied on statements which could be interpreted to mean that McDermott was paying $65.00 per share, this is hardly the logical interpretation of the facts. Similarly, we do not believe that the plaintiffs produced any credible evidence of scienter on the part of McDermott. In sum, although the plaintiffs had the opportunity to demonstrate deception in the tender offer, they have not done so, and the district court properly granted the directed verdict.

*Proxy Claims.* The appellants raise several claims with respect to the proxy statement issued on the proposed merger of B & W and McDermott. Their first claim, that the proxy statement was misleading insofar as it stated that the tender offer price was $62.50, hinges on our finding that the

tender offer price was in fact $65.00 per share. For the reasons stated previously, we decline so to find.

■ The appellants contend secondly that the proxy statement was materially misleading in that it qualified and varied the terms of the merger contained in McDermott's tender offer. As Judge Cannella correctly pointed out, however, "[u]ncontroverted evidence indicates that specific discussions concerning the type and characteristics of the merger securities did not take place until after McDermott's successful tender offer. Thus, it would be disingenuous to conclude that the proxy materially qualified matters unknown but allegedly contained in the tender offer."

Finally, the appellants argue that the proxy statement was materially misleading in that its disclosures concerning McDermott's pleas of guilty to various charges did not specify that one of the charges involved a pattern of racketeering activity and wire fraud. We agree with the district court that the use of ordinary language to describe the substance of the offenses ("commercial bribery, unlawful political contributions and customs violations") did not render the proxy statement misleading.

■ *Breach of Fiduciary Duty and Contract.* We likewise affirm Judge Cannella's decisions on the issues of breach of fiduciary duty and contract. That McDermott was a 49% shareholder does not without more give rise to a fiduciary duty on its part. *See Lewis v. Knutson,* 699 F.2d 230, 235 (5th Cir.1983); *Polin v. Conductron Corp.,* 552 F.2d 797, 808 (8th Cir.), *cert. denied,* 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977). Moreover, there was no evidence of actual domination and control. *See Gottesman v. General Motors Corp.,* 279 F.Supp. 361, 383–84 (S.D.N.Y.1967), *remanded on other grounds,* 414 F.2d 956 (2d

Cir.1969), *cert. denied,* 403 U.S. 911, 91 S.Ct. 2208, 29 L.Ed.2d 689 (1971).

■ We find the appellants' breach of contract claim to be equally unavailing. McDermott's tender offer did not entail a binding commitment to pay any specific consideration in the event of a subsequent merger. Rather, it included only a commitment to propose a merger of B & W and McDermott if McDermott succeeded in its tender offer, and stated McDermott's belief that the "consideration to be received in such combination would have to approximate the price paid pursuant to this offer."[3]

■ In addition, Judge Cannella correctly found that McDermott did not breach the commitment made in its joint proxy statement to exchange outstanding B & W stock for consideration of approximately $62.50. The statement made clear that a "variety of factors . . . may affect stock prices" and, as a result, that the price of the stock received upon the merger "may be more or less than $62.50." The appellants failed at trial to produce sufficient evidence from which the jury could reasonably conclude that they did not receive approximately $62.50. There was uncontradicted expert testimony that it would be misleading to value the McDermott securities with reference only to the date of merger, and, for the six-month period following the merger, the appellees proved that the securities traded consistently within 5% of $62.50, with average combined closing prices within 1% of that amount.

*Impeachment.* Appellants' final contention on appeal, that the district court improperly precluded them from impeaching McDermott's credibility under Fed.R.Evid. 609(a), is without merit. The district judge acted within his discretion in ruling that the evidence offered by appellants to impeach McDermott was not admissible.

Judgment affirmed.

---

**3.** The appellants' reliance on *Lowenschuss v. Kane,* 520 F.2d 255 (2d Cir.1975), is misplaced. *Lowenschuss* concerned only contractual obligations with respect to tendered stock, and the offeror's refusal to purchase the stock in accordance with the terms of its offer. We held there that "[t]here having been no condition

that a minimum number or percentage of shares must be tendered, a binding and enforceable contract arose simply upon tender." *Id.* at 265. Here, the appellants' contract claim concerns stock either not tendered at all, or tendered but not accepted by McDermott, as provided by the terms of its offer.