Constantine and Carla
PANOS, Plaintiffs,

v.

ISLAND GEM ENTERPRISES, LTD., N.V., et al., Defendants.

Robert WOHL and Aida Wohl, Plaintiffs,

v.

ISLAND GEM ENTERPRISES, LTD., N.V., et al., Defendants.

Nos. 82 Civ. 4629 (SS), 83 Civ. 0969 (SS).

United States District Court,
S.D. New York.

March 16, 1995.

170

James M. Shaughnessy, of counsel, New York City, for plaintiffs.

Stroock & Stroock & Lavan, New York City (Melvin A. Brosterman, of counsel), for defendants.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs Constantine and Carla Panos and Robert and Aida Wohl bring this action against Island Gem Enterprises ("Island Gem"), Bankers Life Insurance Company of Nebraska ("Bankers Life"),[1] Yorkshire, N.V. ("Yorkshire"), Chase Manhattan, N.A. ("Chase"), International Sales Management, Ltd. ("International Sales"), and various individual defendants (the "Individual Defendants") for damages resulting from plaintiffs' purchases of certain apartment leases (the "Leases") through International Sales during the 1970's. Plaintiffs contend that defendants' fraudulent concealment of a potential adverse title claim against the property on which the apartments were constructed and two post-purchase amendments of the lease agreements (the "Acceptance and Guarantees" or "A & Gs") violated § 17 of the Securities Act of 1933, 15 U.S.C. § 77q(a); § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5; and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–64. In addition, plaintiffs claim that defendants' conduct constituted common law fraud, and ultimately led to Island Gem's breach of the A & Gs through its wrongful imposition of the amendments. Plaintiffs are seeking compensatory damages and punitive damages on their securities fraud, common law breach of contract, and common law fraud claims, RICO treble damages, and attorneys fees. In addition, the Panoses are seeking rescission of their A & Gs.

---

1. After plaintiffs filed these actions, Island Gem and Bankers Life have changed their names to Sun Resorts Ltd., N.V. and Ameritas Life Insurance Corp., respectively. For convenience, we refer to these defendants by their former names.

Plaintiffs identify their compensatory damages as 1) benefit-of-the-bargain damages for returns on their Lease investments denied pursuant to unlawful amendments to the A & Gs and for the diminution in value of the Leases as a result of the undisclosed title claim and the amendments; and 2) consequential damages stemming from their inability to procure other, profitable investments as a result of the defendants' unlawful conduct. Defendants have filed the instant motion *in limine* to restrict plaintiffs' potential compensatory recovery to out-of-pocket losses or, in the alternative, to rescissionary damages. For the reasons stated below, we grant the motion with respect to plaintiffs' § 10(b) claims, but deny the motion with respect to plaintiffs' fraud and breach of contract causes of action.

## I.

Although this motion relates solely to plaintiffs' benefit-of-the-bargain damages and, for purposes of this motion, we will assume defendants' liability, we must first summarize plaintiffs' allegations to set the stage for evaluating their claims of loss. Plaintiffs assert that in 1957 and 1966, Eric Lawaetz transferred certain parcels of land on the Dutch side of St. Maarten to Island Gem, a company he controlled. He had obtained title to the property from the children of Charles Daniel Esprit Beauperthuy (the "Seven Transferors") who had declared in their deeds of transfer to Lawaetz that they had obtained the land by deed from their father in 1943. Shortly after the transfer, Island Gem adopted a plan to develop the land into the Mullet Bay Beach Club Resort (the "Resort") comprising a group of apartment buildings, a hotel, a golf course, restaurants, and a casino. To finance the construction in part, Island Gem planned to sell the apartments to investors who would share in profits from renting the units to third parties.

Between 1972 and the end of 1977, Constantine and Carla Panos purchased three such Mullet Bay apartments: the first two directly from Island Gem for $82,500 and $54,500, respectively, and the third from Stephen Gott, who had originally purchased the apartment from Island Gem, for $38,500. In each case, the sales were consummated through International Sales, Island Gem's sales agent, and Island Gem provided financing for approximately 75% of the purchase prices. Subsequently, in 1977, the Panoses purchased an undeveloped lot from Island Gem in an area known as Mount Rouge, located on the French side of the island, for $50,000. They planned to build a rental house on that property from the proceeds of the sale of their Mullet Bay apartments. Having never sold their apartments, allegedly because defendants' actions rendered them worthless, the lot remains undeveloped.

In 1978, Robert and Aida Wohl purchased a twin-bedded Mullet Bay apartment from Vincent DeFalco, who had originally purchased the apartment from Island Gem, through International Sales for $39,500 in cash. In late 1979, however, they decided to sell the apartment and purchase a two-bedroom suite under construction at a neighboring resort, Cupecoy Beach Club Condominium Resort ("Cupecoy"). Although they signed preliminary sale papers on the Cupecoy condominium and obtained a Chase mortgage for $78,000 of the $130,000 purchase price, International Sales, which had agreed to market the Mullet Bay apartment, was unable to procure a buyer, allegedly because Island Gem's inability to obtain additional financing for the Resort from Chase had depressed the market for these apartments. While assuring them that a Chase financing package was forthcoming, International Sales informed the Wohls that, as an alternative, it had procured a purchaser for the Cupecoy condominium for the current market price, allegedly $153,000, of which International Sales would receive a $13,000 commission. Having no success selling their Mullet Bay apartment on their own or through International Sales, and being unable to maintain both investments, the Wohls agreed to sell their Cupecoy property.

Over the next few years, the Wohls continued to attempt to sell their Mullet Bay apartment in order to locate elsewhere, and in March 1981 agreed to purchase a town house in California. In that same month, however, they received a copy of Island Gem's certi-

fied financial statements which disclosed, allegedly for the first time to the Wohls, an ongoing title litigation involving the Mullet Bay property. Therefore, realizing that they would be unable to sell their apartment, they backed out of the California sale.

## The Rental Agreement

Pursuant to each direct purchase from Island Gem, the Panoses signed an "Acceptance and Guarantee of your Rights, Privileges, Purchase Price & Terms" (the "A & G"). Likewise, pursuant to their secondary market purchases the Panoses assumed Gott's A & G and the Wohls assumed DeFalcos's. The A & Gs, identical in all four sales, granted a 999–year lease to the purchaser which was "for all practical purposes" a sale of "full and clear property rights."[2] In addition, it provided that the apartment owner would receive a pro-rata share of 50% of the gross rental revenue of all the Mullet Bay apartment units (the "Rent Pool"). Under the "NO–MONTHLY–PAYMENT" financing system, Island Gem would credit an owner's Rent Pool share to an account against which it would draw his monthly purchase price payments, an annual maintenance fee, pro-rata expenses (e.g. taxes, telephone, and bookkeeping fees), and furniture and furnishings expenses. Although the owner was required to pay any deficit in this Rent Pool account on demand, assuming sufficient rental revenue, after an initial down payment the owner would not have to make any further payments to Island Gem. On December 1 of each year, Island Gem would disburse any surplus in the Rent Pool account to the apartment owner. Finally, the agreement provided that Island Gem could amend the A & G's provisions, other than the purchase price, lease term, or payment terms, at any time with the consent of 75% of the lease owners.

**2.** The Acceptance and Guarantee also provided that as soon as the Government of the Netherlands Antilles passed an acceptable condominium law, Island Gem would, with the owners' consent, transform the leaseholds into condominiums. Plaintiffs contend that although the Netherlands Antilles passed such a law, Island Gem never attempted to convert the apartments to condominiums because to do so would have re-

## The Title Claim

In 1971, as a step in providing financing to Island Gem to develop the Resort, Chase hired Dr. Jacob Schiltkamp, local St. Maarten counsel, to provide a title opinion on the property. Schiltkamp's investigation uncovered a potential flaw in the chain of title: the Seven Transferors obtained title not by deed but, if at all, by prescription. After persuading the Seven Transferors to execute a "rectification" deed indicating that they had obtained title by prescription, Schiltkamp issued an opinion stating that in spite of the potential title chain flaw, he believed that Island Gem had full and clear rights to the property. Although Chase went ahead with the financing and Island Gem with the construction in light of this report, the potential title flaw allegedly was not disclosed to the SEC until years later and not revealed to the plaintiffs prior to their purchases.

As the Schiltkamp opinion had contemplated, in May 1973 a group of the Beauperthuy heirs filed a notice of a claim of ownership to the Mullet Bay property and demanded that Island Gem vacate. Although they later withdrew that claim without prejudice, in November 1973 Island Gem entered into a "Letter Agreement" with its four major creditors assigning to them its right to compensation for improvements to the land in the remote case that any ensuing litigation stripped them of title.[3] In November 1976, twenty-seven of the heirs renewed their title assertions by filing suit in the Court of First Instance in St. Maarten, and in April 1981 the court ruled in favor of the heirs, ordering Island Gem to vacate the property. Although that decision was reversed by the Netherlands Antilles appellate court in 1982, and in 1983 The High Court of the Netherlands in The Hague affirmed the reversal, plaintiffs contend that the title cloud had a significant financial impact on Island Gem and the Resort.

vealed a potential adverse title claim to the property.

**3.** Article 653 of the Civil Code of the Netherlands Antilles apparently allows a good faith wrongful possessor to recover improvements that it made to the land in an action for ejectment.

Prior to their first two purchases from Island Gem, the Panoses received prospectuses dated March 6, 1972 and April 5, 1973. Allegedly, neither of the documents disclosed the potential title flaw. Moreover, the Panoses assert that none of the numerous Island Gem mailings they received between 1972 and 1981 contained any notice of the title problem, the Letter Agreement, or, after 1976, the pending litigation. Similarly, Island Gem's certified financial statements for the 1976 through 1979 fiscal years made no mention of the ongoing litigation. Although a prospectus dated March 29, 1974 and a Supplement No. 4 to the April 5, 1973 prospectus dated December 18, 1973 apparently disclosed the potential title chain flaw, the Panoses contend that they never received either of these documents. To the contrary, they assert that their first notice of the title problem came during a phone conversation with Island Gem's vice president in late February or early March 1981.

Like the Panoses, the Wohls claim that when they purchased their apartment unit neither the defendants nor documents that they received from the defendants made mention of the title cloud. They assert that their first notice also came in March 1981 when they received Island Gem's certified financial statements for the year ending August 30, 1980 which disclosed the litigation in a note following the report.

### The Title Claim's Effect

Plaintiffs contend that the ongoing title litigation from 1976 until 1982 prevented Island Gem from offering its stock publicly in the United States as planned and severely impeded its ability to obtain other financing. As a result, Island Gem was unable to finish developing the resort into a profitable enterprise as planned. In the face of dwindling revenues, in May 1981 Island Gem proposed an amendment to the A & Gs whereby certain expenses previously paid out of Island

Gem's portion of the Rent Pool were to be paid from the gross rental revenues. Under this scheme, Island Gem would receive 50% of the *net* rental revenue and the owners their pro-rata share of the other 50% for three years, after which the income would be split 45% to 55% in favor of the owners. Despite Island Gem's urging, the owners did not approve the amendment, and in May 1991 Island Gem closed the Resort. Subsequently, in an effort to reopen, Island Gem proposed yet another amendment (the "First Amendment"), this time backed by a newly formed Mullet Bay Apartments Association (the "Association")—an organization representing the apartment owners. This amendment was approved by over 75% of the owners in October 1981.[4] Like the earlier proposed amendment, this amendment decreased the owners' share of the rental revenues of their apartments. It mandated a similar splitting of the Rent Pool between Island Gem and the owners only after certain resort expenses were paid, but at the end of the three-year term of Chase's $5.5 million line of credit to Island Gem, the pool would be split 70%/30% in favor of the apartment owners. Although the amendment also restricted the owners' right to file legal actions against Island Gem or Chase (if any actions were filed they were to be stayed for the three-year term of the loan), after its adoption, the Association commenced a class action on behalf of the lease owners against Island Gem and others for securities law violations and common law fraud. Plaintiffs contend this action was merely a gesture to appease irate lease owners.[5] In 1984, before taking any action in the case, such as moving for class certification, the Association dismissed the suit.

Apparently, the First Amendment did not solve Island Gem's financial woes. In 1982, in conjunction with a proposed buyout of Island Gem by a group headed by Yorkshire,

---

**4.** Plaintiffs contend that the Association was a sham orchestrated by Island Gem insiders. They point out that the Association's counsel, the law firm of Paul, Weiss, Rifkind, Wharton & Garrison, concurrently represented Arthur Andersen, the accounting firm that certified Island Gem's financial statements that failed to disclose the title cloud.

**5.** Pointing out that the complaint did not name Chase or Arthur Andersen, a concurrent client of the Association's legal counsel, as defendants, plaintiffs contend that the suit was not a serious effort on the part of the Association to protect the owners' legal rights.

N.V. (the "Alsultany Group"), whose controlling shareholder was defendant Kamal Alsultany, also an apartment owner, the Association recommended the adoption of a "Second Amendment" to the A & Gs. This new amendment allegedly further modified the Rent Pool allocation in favor of Island Gem and purported to release any legal claims that the owners may have against Island Gem and Chase. As a prerequisite to its enforcement, however, the amendment required Island Gem to settle the then-ongoing title litigation. Although Island Gem informed the owners that absent the Alsultany Group's buyout, which was dependent on the Second Amendment's adoption, the resort would likely close, plaintiffs contend that the amendment was not approved by 75% of the owners. Nevertheless, in September 1982, the Alsultany Group bought out Island Gem, the Association executed a waiver of the Second Amendment's litigation settlement requirement (the "Rescission Agreement"),[6] and the Alsultany Group imposed the Second Amendment's terms on the apartment owners, including the purported release of claims against Island Gem.[7]

Unsatisfied with the Association, the amendments, and the class action allegedly filed on their behalf, in 1982 and 1983, respectively, the Panoses and the Wohls filed suit against defendants. At bottom, they claim that defendants fraudulently concealed the title cloud on the Mullet Bay property from 1971 until the present in violation of the federal securities laws and the common law and breached the A & Gs by unlawfully imposing the provisions of the First and Second Amendments. They seek compensatory damages, punitive damages, treble RICO damages, and attorneys fees. In addition, the Panoses seek rescission of their Leases.

Realizing that this case has been pending for over twelve years[8] and that a determination of the appropriate measure of damages could be a particularly effective catalyst to settlement, Judge Sotomayor invited the parties to examine plaintiffs' benefit-of-the-bargain damage theories in light of the Second Circuit's recent pronouncement in *Commercial Union Assurance Co. v. Milken,* 17 F.3d 608 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 198, 130 L.Ed.2d 130 (1994). Therefore, at the Court's behest, defendants filed the instant *Motion in Limine to Limit the Measure of Damages to Provable Out–Of–Pocket Expenses,* essentially a motion for partial summary judgment, asking the court to deny plaintiffs' claims for benefit-of-the-bargain damages, and instead to allow a recovery of only out-of-pocket damages or, in the alternative, rescission.[9]

## II.

Plaintiffs' claims for benefit-of-the-bargain damages stem from two theories. First, plaintiffs seek benefit-of-the-bargain damages for defendants' unlawful amendments of the A & Gs, allegedly constituting securities fraud, common law fraud, and breach of contract. Plaintiffs contend that neither the First nor Second Amendments are legally binding because they altered the "payment terms" and therefore could not be imposed by the consent of 75% of the lease owners as outlined in the A & Gs. In addition, plaintiffs argue that defendants procured the amendments through duress and by fraudu-

---

6. Apparently, the litigation settlement prerequisite to the Second Amendment's enforcement could be waived by the Association prior to September 1, 1982.

7. Neither the Wohls nor the Panoses voted to approve the Second Amendment, although under the Alsultany Group's ownership, Island Gem enforced its terms against all of the Lease owners pursuant to the Acceptance and Guarantee amendment provisions. In an earlier opinion, however, Judge Leval found that the release was not binding on the Wohls. *Wohl v. Island Gem Enterprises, Ltd.,* No. 83 Civ. 0969 (S.D.N.Y. Jan. 6, 1993). Defendants have not asserted the release as a defense to the Panos's claims.

8. The *Panos* suit was originally before Judge Broderick and was later transferred to Judge Leval before whom the *Wohl* case was pending. Both cases were then reassigned to Judge Sotomayor after Judge Leval left this Court. The cases are presently before us for this motion only.

9. Defendants also argue that plaintiffs are not entitled to consequential damages. Since Judge Sotomayor confined this motion to addressing only the plaintiffs' benefit-of-the-bargain damage theories, we do not directly address this extraneous contention.

lently concealing the title cloud. Moreover, with respect to the Second Amendment, they apparently assert that since the ultimate terms of the Alsultany Group's buyout were so different than those represented to the owners in connection with their consideration of the Second Amendment, that agreement cannot be enforced against the owners. Therefore, plaintiffs seek monies allegedly due under the terms of the unamended A & Gs, i.e., the benefit of their bargains.

Second, plaintiffs seek what they also describe as benefit-of-the-bargain damages for the loss in value of their investments. Specifically, plaintiffs claim that but for defendants' fraud in concealing the title cloud against the Mullet Bay property and but for the subsequent amendments to their A & Gs, their property would be worth far more than it is today. As the benefit of their bargain, plaintiffs claim they are entitled to the difference between the Leases' actual value today and what they would have been worth absent the fraud. We will address these damages separately under each cause of action below.

A. Securities Fraud [10]

The starting place for evaluating any aspect of a private cause of action for securities fraud is the applicable statute itself. *Pelletier v. Stuart–James Co.*, 863 F.2d 1550, 1557 (11th Cir.1989). That statute, § 28 of the 1934 Act, provides that an aggrieved party may maintain an action for "actual damages on account of the act complained of." 15 U.S.C. § 78bb(a). Noting that Congress left the term "actual damages" undefined, courts interpreting § 28 have been reluctant to read

the statute as applying a straight jacket to their traditional remedial role. *J.I. Case Co. v. Borak*, 377 U.S. 426, 435, 84 S.Ct. 1555, 1561, 12 L.Ed.2d 423 (1964) (federal courts have the power to grant all necessary remedial relief); *Hackbart v. Holmes*, 675 F.2d 1114, 1121 (10th Cir.1982) (district courts have discretion to fashion "a remedy to suit the particular case."). While largely agreeing that the statute forecloses recovery of punitive damages, *see, e.g., Pelletier*, 863 F.2d at 1557; *Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303, 1313 (2d Cir. 1977), equating actual damages with compensatory damages, courts have interpreted the statute as permitting all forms of loss-based relief, whether articulated under out-of-pocket, benefit-of-the-bargain, or other loss theories.[11] As the Second Circuit has stated, "there cannot be any one rule of damages prescribed which will apply in all cases, even where it is conceded that the finding must be limited to actual damages." *Osofsky v. Zipf*, 645 F.2d 107, 111 (1981) (quoting *Birdsall v. Coolidge*, 93 U.S. 64, 70, 23 L.Ed. 802 (1876)). Ultimately, therefore, "[i]t is for the district judge, after becoming aware of the nature of the case, to determine the appropriate measure of damages in the first instance." *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 620–21 (9th Cir. 1981). Section 28 circumscribes this discretion to award actual damages only to the extent it prevents speculative recoveries. *Pelletier*, 863 F.2d at 1558; *Barr v. McGraw–Hill, Inc.*, 710 F.Supp. 95, 98 (S.D.N.Y.1989).

---

10. In their complaint, plaintiffs' assert violations of both § 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder, and § 17 of the 1933 Act. Citing *Finkel v. Stratton Corp.*, 962 F.2d 169, 175 (2d Cir.1992), defendants argue that plaintiffs may not maintain an action under § 17, and hence are not entitled to damages therefrom. Defendants' Mem. in Support, at 17 n. 9. Judge Sotomayor confined the instant motion to addressing damages, not liability or the viability of any liability theory. Because plaintiffs make no differentiation between their § 10(b) and § 17 damages, and because the parties have briefed securities fraud damages only under § 10(b), we will confine our analysis to that section. We admonish plaintiffs, however, to consider whether in good faith they can continue to maintain an action under § 17 in light of *Finkel*.

11. The effect of § 28 on Rule 10b–5 damage recoveries is subject to considerable scholarly debate. At least one commentator suggests that § 28 has no bearing whatsoever on the type of damages recoverable under section 10(b), not even disallowing punitive damages. *See* Andrew L. Merritt, *A Consistent Model of Loss Causation in Securities Fraud Litigation: Suiting the Remedy to the Wrong*, 66 Tex.L.Rev. 469, 486 & n. 80 (1988). Still others attach more significance to its "actual loss" language. *See Alta Health Strategies, Inc. v. Kennedy*, 790 F.Supp. 1085, 1091 (D.Utah 1992) ("[The out-of-pocket damage] rule has its source in 15 U.S.C. § 78bb(a) (1991), which requires actual damages for recovery under 10b–5.").

Possibly due to the wide variety of factual predicates to § 10(b) claims, courts have utilized their discretion to endorse several different compensatory damage theories. *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 154–55, 92 S.Ct. 1456, 1472–73, 31 L.Ed.2d 741 (1972) (disgorgement); *Levine v. Seilon, Inc.,* 439 F.2d 328, 334 (1971) (out-of-pocket damages); *Osofsky,* 645 F.2d at 114 (benefit-of-the-bargain damages); *Esplin v. Hirschi,* 402 F.2d 94, 105 (10th Cir.1968), *cert. denied,* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969) (consequential damages); *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 49 & n. 21 (2d Cir. 1978), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978) (gross economic loss/rescissionary damages). The choice of any one theory over another often depends on how the court characterizes the transaction and the fraud. For example, the out-of-pocket measure of damages constitutes the difference between the price paid for the security and its true value absent the fraud on the date of the transaction. *See* Lewis Loss, Fundamentals of Securities Regulation, at 967 (2d ed. 1988). Based primarily on tort theory, it seeks to compensate a plaintiff for his loss by returning him to the position he occupied before the fraud. Indeed, prior to the enactment of the 1934 Act and *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this was the sole method of recovery for securities fraud under the federal common law. *See Smith v. Bolles,* 132 U.S. 125, 10 S.Ct. 39, 33 L.Ed. 279 (1889). On the other hand, benefit-of-the-bargain damages are an outgrowth of contract principles. Labeled expectation damages in the contract arena, this method of recovery seeks to put an injured plaintiff in the position he would have been in had his expectancy ensued. It is marked by the difference between the security's actual value and what the defendant represented its value to be at the time of the sale. Most states have endorsed this method of recovery under common law deceit causes of action. *See* Loss, *supra,* at 875.

Defendants correctly point out that in most cases brought under the 1934 Act defrauded buyers are restricted to recovering solely their out-of-pocket losses. *Hackbart,* 675 F.2d at 1121; *Pelletier,* 863 F.2d at 157; Loss, *supra,* at 967. This is so not because, as defendants urge, benefit-of-the-bargain damages (or other loss-based relief) can never be recovered by an aggrieved buyer, but because under most circumstances benefit-of-the-bargain damages are highly speculative. *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 859 F.Supp. 743, 752–53 (S.D.N.Y.1994) (citing *Osofsky,* 645 F.2d at 112). *But see Commercial Union Assurance Co. v. Ivan F. Boesky & Co.,* 824 F.Supp. 348, 350 (S.D.N.Y.1993), *aff'd on other grounds,* 17 F.3d 608 (2d Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 198, 130 L.Ed.2d 130 (1994) ("The law does not furnish [benefit-of-the-bargain] damages under Section 10(b)").[12] While calculating the actual value of the security on the date of the transaction under the out-of-pocket formula may not always involve mathematical certainty, the more speculative nature of reconstructing a world in which the plaintiffs' expectations come true often prevents a benefit-of-the-bargain recovery. Reluctant to place the risk of investment on defendants' shoulders, even given their intentional misconduct, courts have opted for the more reliable out-of-pocket measure as their primary remuneration vehicle. *See Huddleston v. Herman & MacLean,* 640 F.2d 534, 555 (5th Cir.1981), *aff'd in part, rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (damages unfair if they compensate investor for nonspecific risks that he assumes by entering market).

Some courts have not hesitated to break this mold when the out-of-pocket measure fails to compensate plaintiffs' losses fully, however. For example, while noting the above principles, the court in *Osofsky v. Zipf,* 645 F.2d 107 (2d Cir.1981), allowed a plaintiff to recover benefit-of-the-bargain damages in spite of the general prohibition. In that case, the plaintiff, a stockholder of the Babcock & Wilcox Company, agreed to a merger

---

**12.** One commentator argues that court preference for the out-of-pocket measure may just be a vestige of the federal common law prior to *Erie.* Robert B. Thompson, *The Measure of Recovery Under Rule 10b–5; A Restitution Alternative to Tort Damages,* 37 Vand.L.Rev. 349, 359 (1984).

in which he would receive $62.50 in preferred stock of the acquiring company for each share of Babcock's stock. On the day of the closing, the preferred package was worth only $59.88 per share on the New York Stock Exchange. Noting that tender offers often exceed the market price of the tendering shareholder's stock, and that out-of-pocket damages would fail to remunerate a defrauded shareholder for the loss of this premium sale price, the court allowed the plaintiff to recover benefit-of-the-bargain damages. *Id.* at 114. Although prior panels of the Second Circuit had seemingly ruled out that type of recovery under the 1934 Act, the court distinguished those cases, holding that at the core of any allowable damage award is its certainty and remunerative ability. While on average in a typical securities case out-of-pocket damages may better serve these goals, because plaintiff's loss of the premium offering price was undisputed and easily quantifiable, the court upheld his claim for benefit-of-the-bargain damages. Notably, however, the court was careful to limit its holding to the "situation involved in [that] case, where misrepresentation is made in the tender offer and proxy solicitation materials as to the consideration to be forthcoming upon an intended merger." *Id.; see also John R. Lewis Inc. v. Newman*, 446 F.2d 800, 805 (5th Cir.1971) (allowing plaintiffs to recover benefit-of-the-bargain damages for defendant seller's failure to exchange unregistered for registered securities as promised); *McMahan*, 859 F.Supp. at 753 (allowing plaintiffs to recover benefit-of-the-bargain damages for defendant seller's failure to honor "right to tender" provisions of indenture); *Redstone v. Goldman, Sachs & Co.*, 583 F.Supp. 74, 76 (D.Mass.1984) (allowing plaintiff to recover benefit-of-the-bargain damages on wrongful steering claim).

Absent the certainty of the promised tender offer price in *Osofsky*, or of the express contractual provisions in *Newman* and *McMahan*, courts have been reluctant to award benefit-of-the-bargain damages for violations of § 10(b). For example, in *Commercial Union Assurance Co. v. Milken*, 17 F.3d 608 (2d Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 198, 130 L.Ed.2d 130 (1994), the court denied benefit-of-the-bargain damages to purchasers of certain limited partnership shares in Ivan F. Boesky & Co., L.P. In that case, after the government disclosed that Boesky had entered a plea and cooperation agreement related to his insider trading activities, the plaintiffs sued Boesky and others for violations of § 10(b). Although a trustee put in charge of liquidating the partnership had already returned 114.6% of their initial investments, plaintiffs argued that they were entitled to amounts that the partnership would have earned but for the fraud. Plaintiffs attempted to quantify this amount by extrapolating returns from what the partnership made in its first three months and comparing returns of other arbitrage firms during the same time period. The appeals court denied plaintiffs' damage claim, noting that "[t]he concept of recovery of damages for a benefit-of-the-bargain is founded on the agreement made, not on a proposed hypothetical agreement built on outside evidence and on speculation regarding what the parties might have done or received had the circumstances surrounding the agreement been different." *Id.* at 614. At the heart of its holding, the court reiterated the principle that "[b]enefit-of-the-bargain damages in a Rule 10b–5 action are not available unless they can be calculated with reasonable certainty." *Id.*

In sum, although securities plaintiffs are normally restricted to an out-of-pocket recovery, when benefit-of-the-bargain damages can be measured with reasonable certainty and those damages are traceable to a defendant's fraud, courts are free to award them. *Rudinger v. Insurance Data Processing, Inc.*, 778 F.Supp. 1334, 1340 n. 11 (E.D.Pa.1991) ("The fact that plaintiffs' loss could be determined with certainty was a key factor in justifying the benefit-of-the-bargain damages in *Osofsky* . . . ."). As *Newman* and *McMahan* indicate, this is particularly the case when contractual provisions clearly outline and quantify a plaintiff's expectations. Applying these principles to the instant case, we find that plaintiffs may not recover for the expectation value of the Leases. Moreover, because plaintiffs' first benefit-of-the-bargain theory stems from breaches of the A & Gs committed years after the purchase of

the securities, which do not support a claim cognizable under § 10(b), plaintiffs are similarly denied these damages.

### 1. Benefit-of-the-bargain: Rental Profits

As articulated above, plaintiffs first seek benefit-of-the-bargain damages under § 10(b) for defendants' wrongful amendments of their A & Gs. Plaintiffs claim that by enforcing the amendments, which altered the Rent Pool disbursement terms of the A & Gs, defendants violated § 10(b). They articulate their loss due to this "fraud" as the difference between the rent pool disbursements they did receive, and what they would have received had Island Gem not amended the A & Gs. In other words, they seek to enforce the provisions of the unamended A & Gs guaranteeing them a pro rata share of 50% of the *gross* rental profits of the Resort apartments.

Under *Osofsky's* "reasonable certainty" standard outlined above, assuming defendants' liability under § 10(b), plaintiffs would be entitled to such damages. Island Gem's own records quantify the gross rental profits of the apartments each year and therefore calculating plaintiffs' Rent Pool participation under the unamended A & Gs would approach mathematical certainty. We need not decide whether the case law supports such a recovery in this case, however, because plaintiffs have failed to establish in their complaint or otherwise that amending the A & Gs, however wrongful, violates § 10(b).[13] Hence, any speculation regarding the damages recoverable due to such a strained reading of that section would serve little purpose.

 The Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), held that § 10(b) proscribes only a defendant's intentional, as opposed to negligent, misrepresentations made in connection with the purchase or sale of securities. As such, a successful plaintiff must allege and prove that a defendant not only misstated facts in connection with a securities transaction, but acted with some level of scienter, either a gross disregard for the truth or actual fraudulent intent, when making those misrepresentations. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir.1993); *Hayden v. Feldman*, 753 F.Supp. 116, 119 (S.D.N.Y.1990). Therefore, a plaintiff may not allege securities fraud on the basis of hindsight. *Shields v. Citytrust Bankcorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994); *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978). While in the present case plaintiffs allege that the amendments themselves were procured by fraud and duress, they make no allegations in their complaint or otherwise that at the time of the sale of the Leases, defendants intended to breach the A & Gs' Rent Pool disbursement provisions. Indeed, the only alleged misrepresentation that defendants made at the time of the sale was concealing the presence of the title flaw. This "fraud," while arguably inflating the value of the Leases, has no connection with defendants' later breaches of the A & Gs and plaintiffs' losses due to the alleged breaches. Absent such a connection, plaintiffs' first claim for benefit-of-the-bargain losses, no matter how readily quantifiable, is not cognizable under § 10(b).

In addition, the fact that state contract law provides a remedy for defendants' alleged actions bolsters our holding that Congress did not intend § 10(b) to reach the instant fact situation. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 478, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1976); *Broad v. Rockwell International Corp.*, 614 F.2d 418, 439 (5th Cir.1980), *modified and decided on other grounds*, 642 F.2d 929 (5th Cir.1981) (*en banc*). Here, the defendants' actions in procuring the amendments sought to affect their relationship with plaintiffs as Lease owners; they were not directed at manipulating the

---

13. The parties have agreed to confine the instant motion to an evaluation of plaintiffs' benefit-of-the-bargain damage theories. Therefore, for purposes of this motion we would normally assume defendants' liability. In deciding damages, however, the Court need not accept wholly unsupported liability theories. Indeed, making such unsubstantiated assumptions would belie the Court's role of adjudicating cases or controversies then before it. Here, although plaintiffs claim that amending the A & Gs caused their losses, they fail to demonstrate that these amendments were prohibited by the language of § 10(b). Therefore, as to this conduct we need not evaluate plaintiffs' damage theory under the securities laws.

Lease market. Expanding § 10(b) to encompass the post-sale breach of contract actions alleged herein would do little to effectuate the Congressional policy of disclosure underlying the securities laws. *Santa Fe*, 430 U.S. at 477–78, 97 S.Ct. at 1303.

In an attempt to sidestep these shortcomings, plaintiffs contend that each of the amendments constituted a "sale of securities" under the meaning of § 10(b) because they so radically altered the original terms of the A & Gs. *See* Plaintiffs' Trial Mem., at 136. Therefore, defendants' failure to disclose the title litigation in connection with the amendment "sales" violated § 10(b) and directly resulted in plaintiffs' losses of their Rent Pool disbursements. We do not agree.

■ The purpose of § 10(b) is not to remunerate plaintiffs for all losses they incur in their securities investments due to a defendant's wrongful conduct. *Marine Bank v. Weaver*, 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982). Instead, the federal securities laws are designed to preserve the integrity of the securities markets through transactional regulation. *Santa Fe*, 430 U.S. at 478, 97 S.Ct. at 1303 (fundamental purpose of 1934 Act is to implement philosophy of full disclosure). To effectuate this purpose, § 10(b) prohibits only frauds perpetrated in connection with purchases or sales of securities. Therefore, while a misleading statement as to the value of a security to be sold may be actionable, post-stock-purchase corporate mismanagement or breach of contractual obligations or fiduciary responsibilities, while possibly equally reprehensible, is not proscribed by § 10(b)'s language. *See Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971) ("... Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement."). Liability hinges on whether a defendant induces a "purchase or a sale" through fraud.

■ In light of *Superintendent of Insurance's* command to read § 10(b) "flexibly, not technically and restrictively," *id.* at 12–13, 92 S.Ct. at 169, courts interpreting the purchase or sale requirement have been reluctant to follow rigidly traditional common law notions of what constitutes a transaction. *See, e.g., Securities and Exchange Comm'n v. National Securities, Inc.*, 393 U.S. 453, 467, 89 S.Ct. 564, 572, 21 L.Ed.2d 668 (1969) (corporate merger meets purchase or sale requirement). The Second Circuit has recently outlined the touchstone of the distinction between what does and does not constitute a purchase or sale as "whether there has occurred 'such significant change in the nature of the investment or in the investment risks as to amount to a new investment.'" *Gelles v. TDA Indus., Inc.*, 44 F.3d 102, 104 (2d Cir.1994) (citing *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir.), *cert. denied*, 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403 (1978). Applying that test here, we find, as a matter of law, that the amendments of the A & Gs, however wrongful, did not constitute separate securities transactions.

The instant case is very similar to *Abrahamson*, in which the court found that amendments to a partnership agreement did not constitute new sales of securities under § 10(b). In that case, plaintiffs, who were limited partners in an investment firm, brought suit against the general partners who managed the firm's funds for misstatements on financial reports indicating that the firm maintained a "low risk stance" toward its investments. Although defendants made these statements only after the initial sale of the limited partnerships, plaintiffs contended that two subsequent amendments to the partnership agreements that, among other things, expanded general partnership rights and authorized a salary for the managing partners constituted a new sale of the limited partnership securities induced by defendants' fraudulent concealment. Finding that these amendments fell short of the "significant change" requirement, the court held that defendants' misstatements were not made pursuant to the purchase or sale of securities. *Id.* at 868.

As in *Abrahamson*, in the present case the amendments to the A & Gs did not so alter plaintiffs' investments as to constitute new transactions. Even granting plaintiffs' assertions that their investment returns were substantially reduced by the amendments, the pre- and post-amendment Leases do not con-

stitute two distinct investments under the *Gelles* standard.

First, the amendments did not change the fundamental nature of the investments as profit-participating Leases. Courts finding investment contract amendments to constitute "purchases or sales," have looked to a change in type of investment as the preeminent factor supporting their holdings. For example, in *Department of Economic Development v. Arthur Andersen & Co.*, 683 F.Supp. 1463, (S.D.N.Y.1988), the plaintiff, who had entered into an investment contract with DeLorean Motor Cars, Inc. and others, relinquished its right to demand a cash buy out of a DeLorean subsidiary's stock which it owned in exchange for the right to trade the stock for a fixed amount of shares in the parent company. The court held that because a right to receive stock was arguably different from a right to receive a cash payment, issues of fact precluded a finding that such an amendment to the investment contract did not constitute a new purchase or sale under § 10(b). *Id.* at 1477. *See also Ingenito v. Bermec Corp.*, 376 F.Supp. 1154, 1180 (modification of investment contract by exchange of relaxed payment schedule on notes for waiver of defenses and estoppel provisions constituted new sale of securities under § 10(b)). Unlike *Department of Economic Development*, in the instant case plaintiffs did not exchange their investments for other, fundamentally different investments, they merely reduced their participatory share in the Rent Pool. Their investments remained essentially the same.

Moreover, the amendments did not significantly alter plaintiffs investment risks. Although the post-amendment A & Gs reallocate the Rent Pool disbursements in favor of Island Gem, the post-amendment investment risk is virtually identical to that of the pre-

amendment package. In neither case are plaintiffs guaranteed any return on their investments.[14] Instead, plaintiffs' risk is tied to the ultimate profitability of the Resort and to Island Gem's ability to rent the apartments to Resort guests, not to plaintiffs' share in the Rent Pool. Plaintiffs make no allegation that the amendments substantially altered that risk.

Therefore, because plaintiffs have failed to allege in their complaint or demonstrate in the instant motion either that the defendants intended to breach the A & Gs at the time of the initial Lease purchases or that the amendments themselves were sales of securities, plaintiffs are not entitled to benefit-of-the-bargain damages under § 10(b) and Rule 10b-5 resulting from the imposition of the amendments.

### 2. Benefit of the bargain: Devaluation of the Leases

Plaintiffs next seek benefit-of-the-bargain damages to compensate them for the loss in value of the Leases. They contend that defendants' fraudulent concealment of the title cloud and wrongful imposition of the amendments to the A & Gs made their Leases unmarketable. As a result, they are seeking the value of what the Leases would have been worth absent defendants' fraud.

■ Plaintiffs may not recover these damages under § 10(b). Since, as we held above, plaintiffs are not entitled to damages from the wrongful imposition of the amendments under the securities laws, they cannot recover the decrease in value of the Leases under that theory. In addition, given the speculative nature of benefit-of-the-bargain damages due to the concealment of the title flaw in connection with the initial purchases, plaintiffs are similarly foreclosed from that method of recovery.[15]

14. Plaintiffs make much of the fact that the amendments altered the "NO–MONTHLY–PAYMENT SYSTEM" by requiring them to make their monthly mortgage payments directly to Chase instead of deducting them from their share in the Rent Pool. Plaintiffs' Trial Mem., at 141. While granting that the amendments did alter the payment scheme somewhat, even under the pre-amendment Leases plaintiffs were never guaranteed that their Rent Pool share would cover their monthly payments. These changes are simply not sufficient to render the amendments new sales of securities. Moreover, as defendants point out, changes to the "NO–MONTHLY–PAYMENT SYSTEM" had no effect on the Wohls, who did not finance the purchase of their apartment.

15. Because we find these damages too speculative to allow their recovery, we need not address defendants' other arguments that they were inad-

In essence, plaintiffs ask the Court to rewrite history by constructing a world in which the Beauperthuy heirs had not asserted title to the Mullet Bay property. As defendants correctly point out, however, *Barrows v. Forest Laboratories, Inc.*, 742 F.2d 54 (2d Cir.1984), does not allow such a departure from reality. As that court stated:

> [G]iving the plaintiff benefit-of-the-bargain damages is appropriate only when they can be established with reasonable certainty. * * * A claim for benefit-of-the-bargain damages must be based on the bargain that was actually struck, not on a bargain whose terms must be supplied by hypothesis about what the parties would have done if the circumstances surrounding their transaction had been different.

*Barrows*, 742 F.2d at 59, 60. Nothing about plaintiffs' second theory of recovery is reasonably certain. Indeed, plaintiffs have cited no authority sanctioning such a recovery and have offered no basis for its calculation, other than stating baldly that real estate experts make these types of calculations every day.[16] As we articulated above, however, those cases that have allowed benefit-of-the-bargain recoveries have done so only when the loss is based on a strict contractual expectation, not expert speculation. Nothing in the

A & Gs provides a basis for calculating what the Leases would have been worth two decades later had the A & Gs' representations of granting full and clear property rights been true. Moreover, allowing plaintiffs to recover the expectation value of the Leases at the time of the sale effectively puts the investment risk solely on defendants' shoulders and vitiates the actual loss requirement for recovery under § 28. Because the leases neither assured plaintiffs a risk-free investment nor supplied any basis for evaluating the benefits they reasonably anticipated, plaintiffs cannot recover benefit-of-the-bargain damages. *See Commercial Union*, 17 F.3d at 614.

### 3. Out-of-pocket/Rescissionary Damages

Although plaintiffs may not recover the value of the Leases in the absence of an adverse title claim, plaintiffs may still seek less speculative remuneration under § 10(b) that is sufficiently tied to defendants' prepurchase fraudulent misrepresentations regarding the title cloud. Defendants have offered two alternatives—out-of-pocket and rescissionary damages—either of which they assert are preferable to a benefit-of-the-bargain recovery.[17] We agree that given suffi-

---

equately pled under Rule 9(g) and that they were not proximately caused by defendants' fraud.

**16.** Plaintiffs do attempt to distinguish *Barrows* by arguing that its holding barring a benefit-of-the-bargain recovery hinged on uncertainty as to the fact of damage rather than on the extent of damage as is at issue here. Citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931) and *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), two antitrust cases which held that once the fact of damage was established, plaintiffs could recover lost profits despite their speculative nature, plaintiffs argue that they are entitled to their lost profits here. We do not agree.

Even granting plaintiffs' creative reading of *Barrows*, *Story*, on which *Bigelow* relies, clearly states that a plaintiff must establish that a defendant's actions were the sole cause of its losses. *See Story*, 282 U.S. at 561–62, 51 S.Ct. at 250. Only after such proof, what Justice Sutherland labeled "the fact of damage," is a plaintiff entitled to recover its lost profits. Here, the volatile nature of real estate markets prevents plaintiffs from establishing with reasonable certainty the effect that the title flaw, as opposed to other economic factors, had on the Leases' valuations.

Hence, they cannot prove that defendants' fraud was the sole cause of their losses. Indeed, this is precisely the reason that courts have been reluctant to endorse the benefit-of-the-bargain theory under § 10(b). It is often based on undue speculation regarding the effect of a defendant's misrepresentations and the profit plaintiffs would have realized but for those misrepresentations.

Moreover, whatever distinctions one may glean from *Barrows*, *Commercial Union* has unequivocally stated without noting the *Story* differentiation that a plaintiff must prove actual loss under § 10(b) with reasonable certainty. *See Commercial Union*, 17 F.3d at 614. Reading the reasonable certainty requirement out of the damage computation rubric would potentially allow plaintiffs to recover more than their actual loss and would violate § 28. In light of *Commercial Union* and *Osofsky*, we feel that the case law is clear in this Circuit that plaintiffs must establish the extent of their loss due to a defendant's conduct with reasonable certainty to recover under § 10(b) and Rule 10b–5. Plaintiffs fail to meet that standard here.

**17.** Citing *Marbury Management, Inc. v. Kohn*, 470 F.Supp. 509 (S.D.N.Y.1979), *aff'd in part, rev'd in part*, 629 F.2d 705 (2d Cir.), *cert. denied,*

cient certainty and evidence of proximate causation, plaintiffs could recover pursuant to either of these measures of damage. However, since the parties have not fully briefed the issues surrounding these theories of recovery and since plaintiffs are normally entitled to choose which damages avenue to pursue, we see no reason to comment upon the merit of either of these measures at this time. Similarly, we decline to address defendants' contentions that previous Rent Pool disbursements and the unpaid balance of the Panoses' mortgage should offset an out-of-pocket damage award. We merely hold here that pursuant to their § 10(b) claims, plaintiffs may not recover on a benefit-of-the-bargain damage theory for either the wrongful imposition of the amendments to the A & Gs or for the fraudulent concealment of the title cloud.

B. The Common Law

Plaintiffs also assert both of their benefit-of-the-bargain damage theories under their common law fraud and breach of contract causes of action. At the outset, since plaintiffs are residents of New York and California respectively and defendant Island Gem is a Netherlands Antilles company, we must determine which jurisdiction's law to apply to plaintiffs' claims. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Under *Klaxon Co. v. Stentor Elec. Mfg.,* 313 U.S. 487, 494, 61 S.Ct. 1020, 1020–21, 85 L.Ed. 1477 (1941), a federal court sitting in diversity applies the choice of law jurisprudence of the forum state. This same principle controls when the court's jurisdiction over state law/common law claims is pendent, as herein. *Norlin Corp. v. Rooney,*

*Pace Inc.,* 744 F.2d 255, 263 (2d Cir.1984). Accordingly, this Court must look to New York choice of law principles in determining which jurisdiction's law will govern.

New York has adopted an "interest analysis" as a guide to making this choice, focusing on the relationship between the respective jurisdictions and the issues in dispute. *Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679, 684 (1985). Before assessing the relative interests, however, the court must determine whether there is an "actual conflict" between the laws of the jurisdictions involved. *Matter of Allstate Insurance Co.,* 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905, 613 N.E.2d 936, 937 (1993) (Kaye, C.J.). Such a conflict exists when " 'one State's interest [in applying its law] cannot be accommodated without sacrificing the other's.' " *Miller v. Bombardier, Inc.,* 872 F.Supp. 114, 117 (S.D.N.Y.1995) (quoting *Cooney v. Osgood Machinery, Inc.,* 81 N.Y.2d 66, 76, 595 N.Y.S.2d 919, 925, 612 N.E.2d 277, 283 (1993) (Kaye, C.J.)). In this case, the parties fail to brief fully Netherlands Antilles fraud and breach of contract law and New York and California breach of contract law. We are therefore unable to determine whether the jurisdictions' laws are in conflict regarding benefit-of-the-bargain recoveries;[18] and hence which law to apply to plaintiffs' common law claims. Therefore, based on the submissions before us, we must deny defendants' motion to restrict plaintiffs' common law damages.

Although the parties have fully briefed the issues surrounding benefit-of-the-bargain damages under § 10(b), they have each devoted only a few pages to addressing damages under the common law. In their trial

449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), defendants have also argued that any recovery should be reduced for plaintiffs' failure to mitigate damages. Because issues of fact surround plaintiffs' ability to resell their Leases, we are precluded from deciding this issue on the instant motion, which is essentially a motion for partial summary judgment. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

18. In the same paragraph in which defendants assert that Netherlands Antilles law controls,

they contend that the Court need only decide choice of law with respect to plaintiffs' punitive damages claims, seemingly granting that no conflict exists regarding plaintiffs' benefit-of-the-bargain damages. Defendants' Mem. in Support, at 23–24 n. 17. On the other hand, if defendants' representation of Netherlands Antilles law and plaintiffs' representation of New York and California law are correct, such a conflict may, in fact, exist. We are unable to determine whether this is the case from the parties' submissions, however.

memorandum, plaintiffs argue that New York law applies to the Panoses' breach of contract and fraud claims and California law to the Wohls', and that both of these states' laws support plaintiffs' benefit-of-the-bargain theories. Plaintiffs' Trial Mem., at 191. Defendants, referring to their trial memorandum, contend that Netherlands Antilles law controls, allegedly preventing a benefit-of-the-bargain recovery. Defendants' Mem. in Support, at 23 n. 17. As a fall back position, defendants claim that even under New York and California law plaintiffs may not recover their asserted damages for common law fraud.[19] *Id.*

While plaintiffs cite specific California and New York case law and applicable statutes to support their damage claims, defendants rely solely on the affidavit of Lucius Halley as proof of Netherlands Antilles law. Citing Article 1382 of the Civil Code of the Netherlands Antilles,[20] Halley contends that plaintiffs may only recover on their fraud claims for "the actual damage suffered as a direct result of defendants' acts," not "speculative" recoveries such as benefit-of-the-bargain damages. Halley Aff., at 1. Similarly, defendants argue that benefit-of-the-bargain damages on plaintiffs' breach of contract claim are unrecoverable under Netherlands Antilles Code Articles 1260–69. Halley Aff., at Exhibit 7. Neither party provides Netherlands Antilles case law specifically addressing benefit-of-the-bargain damages under either fraud or breach of contract causes of action, however. Absent guidance on interpreting Netherlands Antilles law, we are unable to determine from either the parties' briefs or the broad language of the Netherlands Antilles Code whether a conflict in fact exists between the jurisdictions' laws.

Moreover, even if no conflict exists, defendants fail to address plaintiffs' breach of contract theories under New York and California law, and neither party discusses the import of Cal.Civ.Code § 3343(a)(4) which, it appears to the Court, might govern the Wohls' recovery on their fraud claim if California law were to apply. *See Stout v. Turney,* 22 Cal.3d 718, 150 Cal.Rptr. 637, 586 P.2d 1228 (1978).

Given the uncertainty surrounding Netherlands Antilles law, and the partial briefing of New York and California common law, we are forced at this time to deny defendants' motion in limine with respect to plaintiffs' common law damage claims. We invite defendants to renew their motion with respect to these claims, however, if they can demonstrate either 1) that New York and California law do not support either of plaintiffs' benefit-of-the-bargain damage theories under either of plaintiffs' common law claims,[21] or 2) that Netherlands Antilles law denies benefit-of-the-bargain recoveries on plaintiffs' common law claims, and that it controls under the facts of this case.

### Conclusion

For the reasons stated above, defendants' motion to bar plaintiffs' benefit-of-the-bargain damage recovery under § 10(b) is granted, and defendants' motion to restrict plaintiffs' damage recovery under their fraud and breach of contract causes of action is denied. We invite the parties to readdress plaintiffs' common law damage theories at a later time in accordance with the directions above.

SO ORDERED.

---

**19.** Defendants do not address New York and California breach of contract law.

**20.** That Article states:

Every wrongful act by which another party is damaged places those by whose fault the damage has been caused under the obligation to indemnify for it.

Affidavit of Lucius A. Halley, March 6, 1986, Exhibit 3 [hereinafter Halley Aff.].

**21.** With respect to plaintiffs' common law fraud claims, we specifically invite the parties to address the applicability of *Sager v. Friedman,* 270 N.Y. 472, 1 N.E.2d 971 (1936), *Reno v. Bull,* 226 N.Y. 546, 124 N.E. 144 (1919), and their progeny, and Cal.Civil Code §§ 3343(a)(4), (b)(1).